[Cite as *State v. Sapharas*, 2022-Ohio-1157.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 29916 |
|---|---|
| Appellant | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| GUSTAVE A. SAPHARAS | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellee | CASE No. CR 19 09 3017 |

DECISION AND JOURNAL ENTRY

Dated: April 6, 2022

TEODOSIO, Presiding Judge.

{¶1}     Appellant, the State of Ohio, appeals from the order of the Summit County Court of Common Pleas, denying the State's motion to introduce other acts evidence in the prosecution of Appellee, Gustave Sapharas.  This Court reverses.

I.

{¶2}     On April 29, 1970, the body of a white, eighteen-year-old female was discovered in a secluded area in Tallmadge.  The body was identified as K.B., who was last seen walking home from her parents' house in Akron around 11:15 p.m. the previous evening.  An autopsy revealed that K.B. had been strangled and died from a single stab wound to the heart.  The initial investigation into her death proved fruitless, but her clothing and fingernail clippings were preserved over the years.  In 2018, a detective who had taken an interest in the case submitted K.B.'s fingernail clippings for new DNA testing.  The new DNA test uncovered a male profile that was consistent with Mr. Sapharas' DNA profile.

{¶3} On the afternoon of September 28, 1975, the body of a white, twenty-year-old female was discovered on a secluded roadway in Suffield Township. The body was identified as L.D., who was last seen that same day, around 2:30 a.m., in a Tallmadge parking lot. Witnesses who knew L.D. saw her sitting in the passenger's seat of a parked car next to an unidentified white male who was sitting in the driver's seat. An autopsy revealed that L.D. had been stabbed twice, with the fatal wound entering her heart. A piece of a broken steak knife handle was found inside the folds of her shirt, which had been pulled up to expose her breasts. Her pants and underwear had been partially pulled down, and swabs taken from the zipper and waistband of her pants were preserved. When those swabs were later tested for DNA, the test uncovered semen and a male profile that was consistent with Mr. Sapharas' DNA profile.

{¶4} Once Mr. Sapharas emerged as a suspect in the deaths of K.B. and L.D., the police began investigating his criminal history. The police learned that:

- In 1972, Mr. Sapharas was tried in West Virginia on counts of rape and kidnapping. L.W., a twenty-two-year-old white female, reported that Mr. Sapharas forced her into his car at knife point, drove her to a secluded area, strangled her when she refused to perform oral sex, and raped her. Although the police found a steak knife behind the driver's side visor of Mr. Sapharas' car when they arrested him, the case resulted in a hung jury, and the charges were later dismissed.

- In 1973, Mr. Sapharas was accused of attacking R.R., a twenty-year-old white female, after she accepted a ride from him. R.R. reported that Mr. Sapharas drove her to a secluded area, demanded that she perform oral sex, and strangled her

when she refused. R.R. identified Mr. Sapharas as her attacker, but the case was never prosecuted because R.R. left the area after the incident.

- In 1975, Mr. Sapharas was accused of attacking J.S., a twenty-year-old white female, after she accepted a ride from him. J.S. reported that Mr. Sapharas drove her to a secluded area, threatened her with the knife, put his hands around her neck, forced her to perform oral sex, and raped her. Officers met with J.S. immediately after the attack but released Mr. Sapharas without charge because the attack occurred outside their department's jurisdiction. J.S. was told to contact the police department in the jurisdiction where the attack occurred but never did.

- In 1976, Mr. Sapharas was convicted of assaulting S.D., a twenty-year-old white female who accepted a ride from him late one evening after her work shift ended. During the assault, Mr. Sapharas drove S.D. to a side street, strangled her into unconsciousness two separate times, removed her pants, and rubbed the inside of her leg. As a result of the incident, Mr. Sapharas was sentenced to sixty days in jail and two years of probation.

- In 1977, Mr. Sapharas was convicted of rape and carrying a concealed weapon after attacking M.L., a twenty-eight-year-old white female whom he had taken out for a single date. Mr. Sapharas came to M.L.'s apartment when she declined his offer of a second date. While there, he grabbed M.L., pulled a steak knife from his pocket, and threatened to kill her if she did not do what he said. He then forced her to remove her clothing and raped her. As a result of the incident, Mr. Sapharas was incarcerated from 1977 until 1990 when he was released on parole.

- In August 1991, the body of B.P., a twenty-one-year-old white female, was discovered on a secluded road in Licking County. An autopsy revealed that B.P. died of a single stab wound to the heart. Semen was detected on her underwear, and swabs taken from her underwear and fingernail clippings later underwent DNA testing. The DNA found on those items was consistent with Mr. Sapharas' profile, and he was tried for B.P.'s aggravated murder and murder in 2018. The trial resulted in a dismissal on the aggravated murder charge and a not guilty verdict on the murder charge.

- In August 1991, a neighbor of Mr. Sapharas' sister called the police because she saw Mr. Sapharas standing outside while holding a knife over a woman on the ground. Mr. Sapharas was naked, and the woman was partially naked, bleeding, and screaming for help. The woman, D.Y., was a twenty-eight-year-old white female who had been working as a prostitute. D.Y. told police Mr. Sapharas strangled her, repeatedly raped her, and stabbed her with a knife before she fled outside. She sustained a large puncture wound to her chest and several slash wounds to her arm. The incident was never prosecuted but resulted in a parole violation for Mr. Sapharas.

The police learned that Mr. Sapharas' family owned a restaurant, and steak knives were collected from the home of his parents and his ex-wife. The steak knives collected from those homes, as well as the knife collected from the visor of Mr. Sapharas' car in 1972, were all the same brand. The knives also were similar in color, texture, size, shape, and chemical property to the knife handle piece found in the folds of L.D.'s shirt. The police interviewed Mr. Sapharas multiple times in 2019 and asked him about the attacks on L.W., R.R., J.S., and S.D. Mr. Sapharas admitted he

was "guilty of every one of [them]." Regarding his use of a knife, Mr. Sapharas said he sometimes had one with him and sometimes did not. Following their investigation, the police pursued charges against Mr. Sapharas for the death of K.B. in 1970 and the death of L.D. in 1975.

{¶5} A grand jury indicted Mr. Sapharas on eight counts. With respect to K.B., he was charged with abduction resulting in death, second-degree murder, maiming or disfiguring of another, and aggravated murder. With respect to L.D., he was charged with murder, two counts of kidnapping, and attempted rape. Mr. Sapharas later moved to dismiss the two counts of kidnapping and the one count of attempted rape related to L.D., and the trial court granted his motion. Thus, as to L.D., only the murder count remained for trial.

{¶6} Before trial, the State filed a motion to admit evidence of the seven other acts the police uncovered while investigating Mr. Sapharas.[1] Mr. Sapharas responded in opposition to the State's motion, and the trial court held a hearing over the course of three days. Following the hearing, both the State and Mr. Sapharas filed supplemental briefs as well as replies to those supplemental briefs. Upon review of the briefs, the evidence, and the arguments introduced at the hearing, the trial court denied the State's motion to admit evidence of Mr. Sapharas' other acts.

{¶7} The State now appeals from the trial court's denial of its motion to admit other acts evidence and raises one assignment of error for our review.

---

[1] The State's original motion to admit other acts evidence also sought to introduce evidence related to A.W., a sixteen-year-old female. The State did not present any evidence related to A.W. at the other acts hearing, however, and did not include her in its post-hearing briefs. Moreover, the trial court did not address A.W. in its ruling, and the State has not referenced her on appeal. Because the record supports the conclusion that the State abandoned its argument with respect to A.W., this Court will not address A.W. on appeal.

II.

## ASSIGNMENT OF ERROR

THE TRIAL COURT ERRONEOUSLY EXCLUDED OTHER-ACTS EVIDENCE, MANDATING REVERSAL AND A REMAND WITH AN ORDER TO ADMIT THE EVIDENCE AT ISSUE IN THIS CASE.

{¶8} In its sole assignment of error, the State argues that the trial court erred when it denied its motion to admit evidence of Mr. Sapharas' other acts at his trial for the murders of K.B. and L.D. For the following reasons, this Court sustains the State's assignment of error.

{¶9} Other acts evidence "is not admissible when its sole purpose is to show the [defendant's] propensity or inclination to commit crime." *State v. Curry*, 43 Ohio St.2d 66, 68 (1975). "Evid.R. 404(B) does, however, allow evidence of the defendant's other crimes, wrongs, or acts to be admitted '*for other purposes*, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" (Emphasis sic.) *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22, quoting Evid.R. 404(B). When a proponent seeks to admit other acts evidence, trial courts must examine whether the evidence is relevant, whether it has been presented for a permissible, non-propensity purpose, and whether its probative value is substantially outweighed by the danger of unfair prejudice. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 20. *See also Hartman* at ¶ 29. The evidence must be relevant not to the ultimate determination of guilt, but rather, to the particular non-propensity purpose for which it is being offered. *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, ¶ 75. Moreover, that non-propensity purpose "must go to a 'material' issue that is actually in dispute between the parties." *Hartman* at ¶ 27, quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988).

{¶10} An appellate court employs a "mixed standard of review" when analyzing a trial court's decision to admit or exclude other acts evidence. *State v. Lewis*, 9th Dist. Summit No.

29696, 2021-Ohio-1575, ¶ 9. First, the appellate court must independently determine, without any deference to the trial court's determination, whether the evidence is relevant to a permissible, non-propensity purpose. *Hartman* at ¶ 25-28; *Lewis* at ¶ 9. That is because "[t]he admissibility of other-acts evidence under Evid.R. 404(B) is a question of law that [an appellate court] review[s] de novo." *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, ¶ 117. Second, if the evidence is relevant to a permissible, non-propensity purpose, the appellate court next must determine whether the trial court abused its discretion in the admission or exclusion of the evidence under Evid.R. 403(A). *Worley* at ¶ 117; *Hartman* at ¶ 29-30. The abuse of discretion standard applies in that instance because "[w]eighing the probative value of the evidence against its prejudicial effect is a highly fact-specific and context-driven analysis * * * [that] necessarily involves an exercise of judgment * * *." *Hartman* at ¶ 30. *Accord Worley* at ¶ 117.

{¶11} The trial court determined that the State was seeking to admit other acts evidence against Mr. Sapharas to establish identity and motive. The trial court found that the evidence was not relevant to either purpose and only served to establish Mr. Sapharas' propensity to commit such acts. Further, the trial court found that, even if the evidence was relevant to a non-propensity purpose, its probative value would be substantially outweighed by the danger of unfair prejudice if it were admitted. Thus, the trial court denied the State's motion to admit the other acts evidence at trial.

{¶12} The State argues that the trial court erred in its other acts analysis under both Evid.R. 404(B) and 403(A). First, the State argues that it offered the other acts evidence for the legitimate, non-propensity purposes of establishing (1) identity, (2) motive, (3) intent, and (4) absence of accident or mistake. Second, the State argues that the trial court abused its discretion when it summarily concluded that the evidence would be inadmissible under Evid.R. 403(A)

without considering the probative value of the evidence and whether the State lacked alternative means to establish Mr. Sapharas' guilt through less prejudicial means. This Court will consider each of the State's arguments in turn.

**Was the Other Acts Evidence Relevant to Identity?**

{¶13} "Other acts can be evidence of identity in two situations." *Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, at ¶ 88. The first situation occurs when other acts "'form part of the immediate background of the alleged act * * *'" and are "'inextricably related to the alleged criminal act.'" *State v. Lowe*, 69 Ohio St.3d 527, 531 (1994), quoting *State v. Curry*, 43 Ohio St.2d 66, 73 (1975). The second situation occurs when other acts "establish[] a modus operandi applicable to the crime with which a defendant is charged." (Emphasis deleted.) *Lowe* at 531. Because the State has not argued that the first situation applies in this case, we limit our discussion to modus operandi. *See* App.R. 16(A)(7).

{¶14} Modus operandi "is evidence of signature, fingerprint-like characteristics unique enough 'to show that the crimes were committed by the same person.'" *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, at ¶ 37, quoting Weissenberger, *Federal Evidence*, Section 404.17 (7th Ed.2019). "To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and share common features with the crime in question." (Emphasis deleted.) *Lowe* at 531. The other acts and the crimes for which a defendant is on trial must "demonstrate a signature 'method of working' such that the 'separate crimes are recognizable as the handiwork of the same wrongdoer.'" *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, ¶ 42, quoting *People v. Barbour*, 106 Ill.App.3d 993, 999-1000 (1982). "Slight differences between the current and other acts will not affect the admissibility of the other-acts evidence as long as it establishes 'a modus operandi identifiable with the defendant.'" (Emphasis deleted.) *Worley*, 164

Ohio St.3d 589, 2021-Ohio-2207, ¶ 119, quoting *Lowe* at 531. *Accord State v. Jamison*, 49 Ohio St.3d 182, 187 (1990) ("Admissibility is not adversely affected simply because the other robberies differed in some details. * * * The weight to be given to [the] evidence is for the jury to determine.").

{¶15} Identity is a material issue in this case, as, thus far, Mr. Sapharas has not admitted that he was involved in the deaths of either K.B. or L.D. His DNA was found on both women, but it is unclear when it was deposited, and Mr. Sapharas was never identified as having been seen with either woman directly before her death. There was evidence that both women were young, white females who were last seen between 11:00 p.m. and 2:30 a.m. K.B. was walking home alone, and L.D. was spotted in the passenger's seat of a man's car. Both women died from a stab wound to the chest, and both of their bodies were found in secluded areas next to a road. K.B. had been strangled, and L.D.'s clothing had been forced apart to expose her breasts and pubic region. Additionally, a broken steak knife handle was found in the folds of L.D.'s shirt.

{¶16} The State theorized that Mr. Sapharas isolated K.B. and L.D. in a remote location for the purpose of sexually assaulting them, turned physically aggressive when they refused to submit, stabbed them, and left their bodies in the secluded locations. The State argued that the other acts evidence it sought to admit was relevant to prove Mr. Sapharas' identity as K.B.'s and L.D.'s murderer because it tended to show that he (1) approached young, white females while they were alone, generally with the aid of his car; (2) brought them to a secluded location for the purpose of sexually assaulting them; and (3) either strangled them or used a steak knife to force them to submit. According to the State, the other acts evidence shows that the reason Mr. Sapharas' DNA was found on K.B. and L.D. was that he "kidnapped [them] for the purpose of raping them[] and killed them in the process."

**{¶17}** This Court previously summarized the other acts evidence the State sought to introduce at trial. To fully address the issues presented herein, however, this Court finds it necessary to engage in a more thorough review of that evidence. As such, we begin by outlining the other acts evidence, in greater detail, through the testimony introduced at the other acts hearing.

**{¶18}** L.W. testified that Mr. Sapharas attacked her less than two years after K.B.'s murder. She testified that, as she was driving home around 3:00 a.m., Mr. Sapharas hit her car from behind. They both pulled to the side of the road, and L.W. got out to speak with Mr. Sapharas. Mr. Sapharas asked L.W. to sit inside his car to exchange information, but L.W. declined to do so. Instead, she returned to her car to write down her information. As she sat in her car with her door open, Mr. Sapharas approached her, put a knife to her throat, and demanded that she come with him. L.W. testified that Mr. Sapharas walked her back to his car at knifepoint. When she initially refused to climb inside, he choked her and shoved her into the car. He then drove her to a rural road and forced her to remove her clothing. L.W. testified that Mr. Sapharas tried to vaginally rape her but was unable to achieve a sufficient erection. When his efforts failed, he pulled L.W.'s head down so that she would perform fellatio. L.W. testified that she struggled against Mr. Sapharas, but he responded by violently choking her. L.W. then capitulated. After she performed fellatio on Mr. Sapharas, he vaginally raped her. L.W. testified that, during the rape, Mr. Sapharas put his knife behind the visor of his driver's seat. She described the knife as a typical steak knife with a serrated edge. L.W. testified that Mr. Sapharas released her after the incident, and she was later able to find him and report him to the police. She testified that, when the police arrested Mr. Sapharas, they found a steak knife behind the visor of his driver's seat.

**{¶19}** R.R. testified that Mr. Sapharas attacked her about three years after K.B.'s murder. She was waiting at a bus stop when Mr. Sapharas, who she did not know, pulled up to the bus stop

in his car, opened his passenger's door, and began speaking with her. R.R. walked closer to the car because she could not hear what Mr. Sapharas was saying. When she did so, Mr. Sapharas pulled her into the car. R.R. testified that Mr. Sapharas drove her to a secluded access road and indicated that he wanted her to perform fellatio. R.R. refused, and her refusal led to Mr. Sapharas strangling her as he pushed his penis into her face. R.R. testified that she began to pray and, when she did so, Mr. Sapharas stopped. He then asked where R.R. lived and drove her home.

{¶20} J.S. was deceased at the time of the other acts hearing, but two officers testified about an incident involving her and Mr. Sapharas. The incident occurred almost five years after K.B.'s murder and about four months before L.D.'s murder. The first officer testified that he was sitting in his parked cruiser late one evening when Mr. Sapharas approached him. Mr. Sapharas told the first officer that he had engaged in consensual sex with a woman he met at a restaurant, but she had jumped from his car. Mr. Sapharas told the first officer that he wanted to tell his side of the story because he believed the woman meant to accuse him of rape. Meanwhile, the second officer spoke directly with J.S., the woman who had jumped from Mr. Sapharas' car. J.S. was visibly upset when she spoke with the second officer. She told him that she was walking outside when a car stopped alongside her and its driver asked if she wanted a ride. J.S. indicated that the driver, Mr. Sapharas, was persistent, so she eventually got in his car. J.S. said that Mr. Sapharas drove her to a gravel pit off Home Avenue and tried to kiss her. When she resisted his advances, he pulled out a knife. J.S. said that Mr. Sapharas threatened her with the knife, put his hands around her throat at one point, and forced her to remove her clothes. She reported that Mr. Sapharas tried to vaginally rape her but was unable to achieve a sufficient erection. He then forced her to perform fellatio until he was able to achieve an erection, at which point he vaginally raped

her. J.S. told the second officer that Mr. Sapharas offered to drive her home, but she jumped from his car when he stopped at a red light.

{¶21} S.D. testified that Mr. Sapharas attacked her about one month after the incident involving J.S. At the time, S.D. was a waitress and frequently walked home when her late shift ended. She testified that, after she left work one evening, a man pulled up in his car and offered her a ride. S.D. did not know the man, who she later identified as Mr. Sapharas, but she accepted a ride from him. She testified that he drove for a while before veering off onto a side road and stopping. He then grabbed her by the throat and choked her into unconsciousness. S.D. testified that she regained consciousness at some point and felt Mr. Sapharas rubbing the inside of her leg. She testified that she was still wearing her underwear, but her pants had been removed. S.D. began to moan, and Mr. Sapharas choked her until she stopped. He then asked her if she wanted to be his prostitute. When S.D. nodded yes, Mr. Sapharas told her to get dressed. He released S.D. at a place of her choosing, and she walked to her brother's house. S.D. stated that, as a result of the incident, her entire face was bruised, her eyes were filled with blood, there were marks on her neck, and she sustained a ruptured eardrum. She also had a burn on the inside of her thigh that was about the size of a cigarette lighter and a belt mark on her leg that matched a belt she had seen on the dash of Mr. Sapharas' car. S.D. did not recall receiving any of the foregoing injuries or having her pants removed. She reasoned that those things must have happened when she was unconscious.

{¶22} M.L. testified that Mr. Sapharas attacked her about a year after L.D.'s murder. She testified that she met Mr. Sapharas at a night club and agreed to go on a date with him. Although Mr. Sapharas had said he was a police officer when they met, she learned on their date that he had lied. Mr. Sapharas told M.L. that he had pretended to be a police officer because he thought it

would make her feel more comfortable with him. M.L. testified that she feigned illness to end the date early and had Mr. Sapharas take her home to her apartment. When he called her a week later to ask her out again, she told him she was not interested. About twenty to thirty minutes later, Mr. Sapharas showed up at her apartment and appeared dejected. M.L. allowed him inside and spoke with him for about ten to fifteen minutes before indicating that it was time for him to leave. As she walked Mr. Sapharas to the door, he grabbed her neck from behind, removed a steak knife from his jacket, held it to her throat, and threatened to kill her if she failed to do what he asked. He then forced her to remove her clothing and raped her. M.L. testified that Mr. Sapharas calmed down after the rape and ultimately left her apartment. As previously noted, the attack on M.L. resulted in Mr. Sapharas being incarcerated from 1977 until 1990.

{¶23} The year after Mr. Sapharas was paroled, the body of B.P. was discovered. The record contains limited information about B.P. The State was not permitted to call the officer in charge of her case to testify. Instead, the trial court informed the State that it could submit an affidavit from that officer, the investigative reports from the case, or the trial transcript from the case for in camera review. At the close of the other acts hearing, the State indicated that it would be obtaining a transcript from the trial in B.P.'s case. It later cited that transcript in a supplemental filing, but the transcript is not a part of this Court's record. The only evidence in the record about B.P. is testimony the State elicited from the officer who investigated the murders of K.B. and L.D. Sergeant Doug Bohon testified that he learned of B.P.'s case while investigating Mr. Sapharas. He learned that B.P. died as the result of a single stab wound to the chest and that her body was found a few feet off a secluded road. Semen was identified on her clothing, and a male DNA profile consistent with Mr. Sapharas' profile was discovered when swabs of her clothing and her

fingernail clippings were tested. Mr. Sapharas never admitted that he killed B.P., and he was acquitted in the trial for her murder.

{¶24} One week after B.P.'s body was discovered, Mr. Sapharas was seen standing over D.Y. with a knife as she screamed for help. D.Y. was deceased at the time of the other acts hearing, so the State called two other witnesses to testify about the incident: a neighbor who saw part of the incident and the police officer who responded to the scene. The neighbor lived directly next door to Mr. Sapharas' sister and described being awoken by yelling at about 6:30 a.m. When she looked out her window to see what was happening, she spotted Mr. Sapharas standing over a woman on the grass (D.Y.) as the woman scooted away and yelled for help. The neighbor testified that Mr. Sapharas was completely naked, covered in blood, and holding a knife. Meanwhile, D.Y. was naked from the waist up and likewise covered in blood. The neighbor testified that her husband opened their bedroom window and yelled at Mr. Sapharas, at which point D.Y. fled and hid inside a nearby garage. D.Y. was still there when the police arrived on scene.

{¶25} The officer who responded to the scene spoke with Mr. Sapharas first. The responding officer testified that Mr. Sapharas looked to have a knife wound on his cheek and groin area and claimed D.Y. had attacked him with a kitchen knife when he refused to pay her for sex. The responding officer later spoke with D.Y. at the hospital, however, and she denied attacking Mr. Sapharas. D.Y. stated that she was walking down the street when Mr. Sapharas pulled up in his car and offered her money and drugs in exchange for sex. She ultimately agreed to the arrangement, and Mr. Sapharas drove her to his sister's house. D.Y. told the responding officer that she fell asleep on the ride and awoke to Mr. Sapharas choking her. She indicated that Mr. Sapharas repeatedly raped her in the upstairs bedroom of the house before forcing her to shower and allowing her downstairs. After they went downstairs, D.Y. stated, Mr. Sapharas grabbed a

knife from the kitchen and stabbed her. The responding officer testified that D.Y. sustained a large puncture wound to her chest and two slash wounds to her arm. When he asked Mr. Sapharas how D.Y. had sustained those injuries, Mr. Sapharas said he had "no idea" and suggested they must have happened "in the scuffle."

{¶26} Initially, this Court notes that, for other acts to be relevant, "there must be some threshold showing that the act for which the evidence is offered occurred." *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, at ¶ 28. Mr. Sapharas specifically acknowledged in an interview with the police that he attacked L.W., R.R., J.S., and S.D. He also was convicted of crimes with respect to S.D. and M.L. In light of his admissions, his convictions, and the foregoing testimony, there is no question that the State met its threshold showing with respect to those five women. *See id.* While Mr. Sapharas was acquitted in his trial for B.P.'s murder, the State need not prove other acts evidence beyond a reasonable doubt. *State v. Carter*, 26 Ohio St.2d 79, 83 (1971). The evidence is admissible so long as there is "'substantial proof that the alleged similar act was committed by the defendant.'" *Hartman* at ¶ 28, quoting *Carter* at 83. Even if the presence of Mr. Sapharas' semen on B.P.'s clothing and his DNA under her fingernails was insufficient to convict him beyond a reasonable doubt, that evidence amounts to substantial proof that he murdered B.P. Likewise, the statements D.Y. made to the police, the testimony of the neighbor and responding officer, and the fact that the incident resulted in a parole violation for Mr. Sapharas amount to substantial proof that he committed the acts against D.Y. The State, therefore, also met its threshold showing with respect to B.P. and D.Y. *See Hartman* at ¶ 28.

{¶27} Upon review, this Court concludes that all but one of the other acts described herein share idiosyncratic features with one another and the murders with which Mr. Sapharas has been charged in this case. *See id.* at ¶ 37. The other acts Mr. Sapharas committed with respect to L.W.,

R.R., J.S., S.D., B.P., and D.Y. tend to establish his identity as the individual who murdered K.B. and L.D. because they "share common features with the [murders]," *Lowe*, 69 Ohio St.3d at 531, and evidence "a signature 'method of working' * * *." *Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, at ¶ 42 quoting *Barbour*, 106 Ill.App.3d at 999-1000. Specifically, those other acts demonstrate that Mr. Sapharas would (1) seek out a young white female who was on her own either by chance or under circumstances he created; (2) ensure they were together in a secluded location, usually by driving the female to that place in his car; and (3) threaten or employ physical violence, usually by means of choking or a steak knife, to force the female to engage in sexual activity. Those same idiosyncratic features were present during the murders of K.B. and L.D. Both women were young, white females, both were last seen walking alone (K.B.) or in the presence of an unknown male (L.D.), both were taken to secluded locations near roadways where their bodies were later discovered, and both were stabbed. Moreover, the evidence tends to show that both women resisted their attacker, hence the presence of his DNA under their fingernails and the broken knife handle in the folds of L.D.'s shirt. The fact that details of the other acts varied to some degree is immaterial, as those differences bear upon the weight of that evidence rather than its admissibility. *See Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, at ¶ 119; *Jamison*, 49 Ohio St.3d at 187. Likewise, the fact that many of the other acts took place after the murders is inapposite because, to establish modus operandi, other acts evidence need not pre-date the act for which a defendant is on trial. *See, e.g., State v. Ross*, 9th Dist. Summit No. 26694, 2014-Ohio-2867 (upholding admission of other acts evidence from 2004 to establish modus operandi in trial for victim's 1999 murder). The other acts involving L.W., R.R., J.S., S.D., B.P., and D.Y. tend to establish Mr. Sapharas' identity as the perpetrator of K.B.'s and L.D.'s murder. *See State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 189. Thus, the record reflects that evidence was presented

for that permissible, non-propensity purpose. *See Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, at ¶ 20.

{¶28} This Court cannot reach the same conclusion with respect to M.L. While there are similarities between the attack on M.L. and the murders, we cannot say that the attack on M.L. is so related to the murders that it would be "'recognizable as the handiwork of the same wrongdoer.'" *Smith* at ¶ 42, quoting *Barbour*, 106 Ill.App.3d at 999-1000. M.L. met Mr. Sapharas under entirely different circumstances and went on a date with him before he convinced her to allow him inside her apartment. While he used a steak knife to rape her, the use of a weapon in a rape is not necessarily unique to Mr. Sapharas. *See generally Lowe* at 532 ("The use of rope itself does not provide a distinctive behavioral fingerprint."). Mr. Sapharas did not accost M.L. while she was outside her home, lure or force her into his car, or transport her anywhere before raping her. He knew her, and the attack he perpetrated against her stemmed from her refusal to continue a romantic relationship with him. The differences between her case and the others are not "slight" such that they have no bearing on admissibility. *See Worley* at ¶ 119. Because the attack on M.L. does not tend to show that Mr. Sapharas perpetrated the murders of K.B. and L.D., it does not serve to establish the non-propensity purpose of identity. *See Williams* at ¶ 20.

**Was the Other Acts Evidence Relevant to Motive?**

{¶29} "Motive evidence establishes that the accused had a specific reason to commit a crime." *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, at ¶ 48. For example, in a trial for the rape of a minor, evidence that a defendant had a prior sexual relationship with a minor might be admissible to refute the notion that the defendant had been falsely accused and to show the motive he had to target, mentor, groom, and sexually abuse teenage boys. *Williams* at ¶ 22. Evidence that a mother frequently used babysitters, instructed them to give her child unprescribed codeine, and

reacted joyfully when the child died might be admissible to show she had a motive to kill her child so he would no longer interfere with her desired lifestyle. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 77-87. Finally, evidence that a defendant told someone he was going to bars to lure customers outside and rob them might be admissible to show the motive he had to murder a victim during the commission or attempted commission of a robbery. *See State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, ¶ 86. "There need be no similarity between the other-acts evidence and the crime charged under a motive theory * * *." *Hartman* at ¶ 48. The other acts evidence simply must "have a tendency to make the existence of a motive 'more probable * * * than it would be without the evidence[.]'" *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 149, quoting Evid.R. 401. "Where, in a murder case, the evidence is purely circumstantial, the identification of the killer is not shown by direct evidence, and, therefore, his identity must be proved, motive or lack thereof becomes an important question * * *." *State v. Lancaster*, 167 Ohio St. 391 (1958), paragraph three of the syllabus.

{¶30} We begin with the State's argument that motive is an element the State must prove in this case. The State notes that Mr. Sapharas was charged with aggravated murder in violation of R.C. 2903.01(B)[2] and abduction resulting in death in violation of R.C. 2901.28. The State argues that the aggravated murder charge will require it to prove that Mr. Sapharas killed K.B.[3]

---

[2] Mr. Sapharas was charged with aggravated murder with respect to K.B. We would note, however, that R.C. 2903.01 did not take effect until 1974, four years after K.B. was killed. Before 1974, the crime now known as aggravated murder existed strictly as murder in the first degree. *See State v. Taylor*, 78 Ohio St.3d 15, 18-19 (1997), citing Former R.C. 2901.01. It is not clear from the record why the State charged Mr. Sapharas with aggravated murder under R.C. 2903.01(B) rather than murder in the first degree under Former R.C. 2901.01. Because the issue need not be resolved in the context of this interlocutory appeal, we take no position on it at this time.

[3] In its brief, the State erroneously attributes the aggravated murder charge to the death of L.D. rather than the death of K.B. The only pending charge that remains with respect to L.D., however, is a charge of murder under R.C. 2903.02(A) ("No person shall purposely cause the death of

during a rape or attempted rape and the abduction charge will require it to prove he killed her during a kidnapping. Thus, the State avers, motive is an element of each offense.

{¶31} This Court rejects the State's argument that motive is an element that the State must prove in this case. Mr. Sapharas has not been charged with any type of specification or penalty enhancement that will require the State to establish a specific motivation on his part. *Compare State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 18 (noting that motive was "absolutely material" where defendant was charged with kidnapping with a sexual-motivation specification). He has been charged with basic homicide offenses. While often relevant in the prosecution of homicides, "[m]otive is not an element of the crime of homicide required to be established to warrant a conviction." *Fabian v. State*, 97 Ohio St. 184, 189 (1918). As such, this Court rejects the State's argument to the contrary.

{¶32} While not an element the State must prove, motive is a material issue in this case. *See Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, at ¶ 27, quoting *Huddleston*, 485 U.S. at 686. That is because, thus far, Mr. Sapharas has not admitted that he was involved in the deaths of either K.B. or L.D. His DNA was found on both women, but it is unclear when it was deposited, and he was never identified as having been seen with either woman directly before her death. As previously noted, motive "becomes an important question" in murder cases where "the evidence is purely circumstantial, the identification of the killer is not shown by direct evidence, and, therefore, his identity must be proved * * *." *Lancaster*, 167 Ohio St. 391 at paragraph three of the syllabus. Because the State will have to rely on circumstantial evidence to prove Mr. Sapharas'

---

another * * *."). Both the aggravated murder charge and the abduction resulting in death charge pertain to K.B.

identity as the individual who killed K.B. and L.D., his motive for doing so is both relevant and material.

{¶33} Upon review, this Court must conclude that several of the other acts the State sought to admit herein, including the attack on M.L., tend to establish that Mr. Sapharas had a specific reason to kill K.B. and L.D.; to wit: that they failed to capitulate when he kidnapped them and tried forcing them to engage in sexual activity. *See Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, at ¶ 48. M.L. specifically testified that Mr. Sapharas threatened to kill her with his steak knife if she did not submit when he told her to take off her clothes and raped her. Mr. Sapharas also: (1) took L.W. at knifepoint and violently choked her when she initially refused to perform fellatio; (2) choked R.R. when she initially refused to perform fellatio; and (3) threatened J.S. with a knife and placed his hands around her throat when she initially resisted his sexual advances. Further, the evidence tends to show that Mr. Sapharas stabbed B.P. in the chest and killed her as she resisted his sexual assault (hence the presence of his semen on her clothing and his DNA beneath her fingernails). The fact that some or all of these other acts occurred after the murders of K.B. and L.D. is immaterial, as there is no requirement that acts probative of motive pre-date the act for which the defendant is on trial. *See, e.g., State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 47. The foregoing evidence makes more probable than not the existence of the motive Mr. Sapharas had to kill K.B. and L.D. *See id.*; *Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, at ¶ 149, quoting Evid.R. 401. Thus, the record reflects that the evidence was presented for a permissible, non-propensity purpose. *See Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, at ¶ 20.

**Was the Other Acts Evidence Relevant to Intent or Absence of Accident or Mistake?**

{¶34} Lastly, the State argues that the other acts it seeks to admit herein are relevant to prove intent and absence of accident or mistake. The State notes that the trial court did not address

either of those non-propensity purposes in its decision. The State asks this Court to conclude that the trial court erred when it failed to find that Mr. Sapharas' other acts are probative of his intent and lack of mistake or accident. Because a ruling to that effect would be premature at this juncture, however, we decline to address the State's argument on its merits.

{¶35} "Intent is an element of most crimes, but it typically is not a material issue for other-acts purposes unless it is genuinely disputed" or a defendant has been charged with a specific-intent crime. *Hartman* at ¶ 55. "Thus, intent evidence is not admissible when 'the requisite intent is presumed or inferred from proof of the criminal act itself,' or when intent is not in issue at all, such as when the defense theory is that the act never occurred." *Id.*, quoting 1 *Wharton's Criminal Evidence*, Section 4:31 (15th Ed.2019). Absence of mistake or accident "is often closely linked to intent * * *." *Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, at ¶ 45. "Such evidence demonstrates, ''by similar acts or incidents, that the act in question was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge.''" *Id.*, quoting *Hartman* at ¶ 52, quoting McCormick, *Evidence*, Section 190, at 804 (4th Ed.1994). The admissibility of absence of mistake or accident evidence depends upon whether the defendant is claiming that the criminal act never occurred at all or whether he is claiming that he committed the act without the requisite criminal intent. *See Hartman* at ¶ 52-53. Because there is "a thin line between the permissible use of other-acts evidence to show intent and the impermissible use to show propensity * * * courts should use caution when evaluating whether to admit other-acts evidence for the purpose of showing intent or absence of mistake." *Id.* at ¶ 57-58.

{¶36} This matter comes before the Court on the State's interlocutory appeal from the trial court's denial of a pre-trial motion to admit other acts evidence. Thus, Mr. Sapharas' defense in this matter has yet to be revealed. The State argues in its appellate brief that it "*expects* [Mr.]

Sapharas will contest his identity as [K.B.'s and L.D.'s] killer" and it "*expects* [he] will argue that each woman's death was unintentional." (Emphasis added.) Either expectation is purely speculative at this juncture, however, as the case has yet to proceed to trial. Whether Mr. Sapharas' other acts will become relevant to prove his identity and/or absence of mistake or accident will depend upon the defense he advances at trial. *See id.* at ¶ 52; *Smith* at ¶ 49 (evidence admissible to show absence of mistake because defendant placed his intent at issue by claiming his actions were accidental). Thus, we must conclude that any argument related to the admissibility of his other acts to prove identity and absence of mistake or accident is premature, and we decline to address it.

**Is the Probative Value of the Other Acts Evidence Substantially Outweighed by the Danger of Unfair Prejudice?**

{¶37} This Court has already determined that the other acts the State sought to admit herein are probative of either identity or motive, and therefore, were offered for a legitimate, non-propensity purpose. The only remaining question is whether the trial court abused its discretion when it concluded that those other acts were inadmissible because their probative value was substantially outweighed by the danger of unfair prejudice. *See Hartman* at ¶ 29-30; *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, at ¶ 20.

{¶38} As previously noted, the weighing of the probative value of other acts evidence against its prejudicial effect "is a highly fact-specific and context-driven analysis * * * [that] necessarily involves an exercise of judgment * * *." *Hartman* at ¶ 30. *Accord Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, at ¶ 117. While those decisions lie within the sound discretion of trial courts, there are "important considerations" of which trial courts should be mindful when performing their Evid.R. 403(A) analysis. *Hartman* at ¶ 31. First, trial courts should consider "the

extent to which the other-acts evidence is directed to an issue that is actually in dispute." *Id.* "As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of unfair prejudice decreases." (Emphasis deleted.) *Id.* Second, trial courts should consider "whether the prosecution is able to present alternative evidence to prove the same fact through less prejudicial means and whether the other-acts evidence is probative of an essential element of the crime or an intermediate fact in the case." *Id.* at ¶ 32. Notably, "[t]he exclusion of relevant evidence under Evid.R. 403(A) requires more than mere prejudice, because anything adverse to a party's case could be deemed prejudicial to that party." *Worley* at ¶ 125. "[O]nly evidence that is *unfairly* prejudicial is excludable." *Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, at ¶ 23.

{¶39} The trial court's prejudice analysis was limited to the following paragraph:

> Here, the nature of the prior acts is no doubt inflammatory – the various attacks, abductions, assaults and rapes of women and the killing of another. Therefore, the Court must be mindful of the potential for prejudice, which is high. As stated above, this Court cannot find a non-propensity purpose for which the State is offering the other acts evidence. Nor does it find that any potential probative value is outweighed by the possibility for prejudice. Accordingly, the other acts evidence shall not be admitted.

Because the trial court did not find the other acts evidence to be relevant to a non-propensity purpose, it did not consider "the extent to which the other-acts evidence is directed to an issue that is actually in dispute." *Hartman* at ¶ 31. Nor did it consider whether the State will be able to present alternative evidence to prove those same facts through less prejudicial means and whether the other acts evidence is probative of an essential element or intermediate fact in the case. *Id.* at ¶ 32.

{¶40} The record supports the conclusion that the trial court performed its prejudice analysis based upon an erroneous legal conclusion: that Mr. Sapharas' other acts were not relevant

to any permissible, non-propensity purpose. This Court has determined as a matter of law, however, that all of Mr. Sapharas' other acts tend to establish either his identity or his motive. *See* Discussion, *supra*. The degree of prejudice he will sustain if his other acts are admitted must be reexamined in light of our conclusion that his acts are being offered for the legitimate, non-propensity purposes of identity and motive. Because this Court acts as a reviewing court, we decline to conduct that analysis in the first instance. *See State v. Holler*, 9th Dist. Wayne No. 21AP0013, 2021-Ohio-4599, ¶ 16. Instead, this Court reverses and remands this matter for the trial court to apply Evid.R. 403(A) in light of the conclusions we have reached in this opinion and the important considerations identified by the Ohio Supreme Court in *Hartman*. *See Hartman* at ¶ 31-32. For the foregoing reasons, the State's sole assignment of error is sustained.

### III.

{¶41} The State's sole assignment of error is sustained. The judgment of the Summit County Court of Common Pleas is reversed, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period

for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

THOMAS A. TEODOSIO
FOR THE COURT

HENSAL, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellant.

JACOB T. WILL, Attorney at Law, for Appellee.

EDDIE M. SIPPLEN, Attorney at Law, for Appellee.